Next case up this afternoon is 4-12-1100. Fakes v. Eloy. Appearance of Lisa Corwin, U.S. Chief of the Appellant and Charles Hughes, U.S. Chief of the Appellate. Lisa Corwin, you may proceed. Thank you. May it please the Court? Counsel. I am Lisa Corwin, and I do represent the plaintiff Mary Fakes in this case. Her sister was Laura Alice Powell. The case is a medical negligence case. Ms. Powell had a condition known as esophageal varices. I'm not sure if the Court is familiar with that condition. I wasn't until I had this case, but it's basically varicose veins that are in your esophagus, is sort of a way to think of it. And if those veins bleed or burst, it's a life-threatening condition. And that's undisputed by any of the witnesses or either side in the case, that it's an urgent and life-threatening condition if those varices bleed. My client went into Decatur Memorial Hospital on November 26th at 11 o'clock p.m., and she was cared for by the defendant in this case, Dr. Eloy. And at that point in time, there was evidence that those varices had bled. One of the allegations of negligence was that he did not check to see whether they were currently bleeding, but because they had bled, he scheduled a surgery for the following morning at 10 a.m. called banding. And this is a simple procedure that you do to stop the bleeding, and it can be done preventatively to prevent varices that look like they might bleed from bleeding and if a varice has blood, it can prevent them. Obviously, it stops the bleeding and prevents them from bleeding further. He scheduled that treatment for 10 o'clock the next morning. My client never made it to surgery the next morning because she died in the interim. She literally bled to death while a patient of the defendant's there at Decatur Memorial Hospital. She was pronounced dead at 821 a.m. the following morning by Dr. Duncan, who was another physician there who came to the hospital and pronounced her dead. One of the issues on appeal in this case is the cause of her death, and I started off the trial in what I consider to be a pretty favorable position because I had the defendant in the case actually disagreeing with his own expert. The defendant's deposition was taken. It was the first deposition I took in the case, and I had him hold that it was his opinion to a reasonable degree of medical certainty that my client bled to death, these bleeding varices were the cause of her death. After numerous depositions were taken, one of the last depositions in the case to be taken was the deposition of the defendant's expert, Dr. User. Unbeknownst to me, until I had the witness on the stand and was ambushed with the testimony, the defendant had been given Dr. User's testimony, and the defendant doctor changed his testimony and changed his opinion as to the cause of my client's death while on the stand. That was never disclosed to me, clear Rule 213 violation. Rule 213i, duty to supplement. I had no idea that, number one, he had even seen the testimony, but number two, that he was going to change his testimony to comport with and be consistent with that of his expert. So I started off the trial believing that I had a defendant who disagreed with his own expert. What did Dr. User say was the cause of death? He said that something happened. Something happened around 2 o'clock in the morning and she had a gastrointestinal event. Something happened. Didn't she bleed to death from the varices? Dr. User said he doesn't know what happened. She clearly bled to death, but he said that there was something that happened that caused that. Was no autopsy performed or was there an autopsy performed? No autopsy was performed. I was going to ask you something else too. Go ahead. Okay. In reliance on the White decision, White v. Garlock, which was a decision authored by Your Honor Justice Steigman, very similar facts, just the idea of changing your testimony, just that difference there would be sufficient to award the plaintiff a new trial. Of course, one of the differences was that was the controlled expert who was the outside expert as opposed to the defendant himself. And in this case, you impeached him substantially with his earlier statements. You were permitted to bring out all of that, weren't you? I was. I did impeach him. And the jury heard it all, heard what he had earlier said, and also the difference is because he's a party, that's substantive evidence. Well, as a party, he's still a 213F3 witness. Well, I'm talking about the question is the prejudice you've suffered. I think it was extremely prejudicial because, and in White they were able to impeach as well, so you can always impeach, but what happened in this case that compounded that is that the jury was left with the impression, based on the tactics of defense counsel, that I was trying to do something wrong by impeaching the witness, and that I was only presenting half the story. And that gets to another allegation of error in this case, which is a violation in addition to Rule 213 and some other rules, a violation of Rule 212. Defense counsel got up and handed the doctor his discovery deposition and said, start reading. And the doctor started reading his discovery deposition. I had never seen anything like it in my life. I objected and said, there's no question pending. He can't just read from his discovery deposition. At which point Mr. Hughes said, well, I'll ask him some questions then. So he stood up next to the witness there at the witness stand, and together they were reading his discovery deposition to the jury. I again objected, and counsel was like, rule of completeness, Your Honor, I should be able to complete this. There was never an objection that I had only read part of an answer or that I hadn't read a complete document. No objection under rule of completeness when I was impeaching the witness. What defense counsel was doing was bolstering me. Well, there wouldn't be an objection to rule of completeness. There's nothing improper in your questioning. The question on the rule of completeness is, given your questioning, should he be able to then complete the rest of the statement? If I only read part of the statement, what he was doing was reading page after page after page of the witnesses' discovery deposition. You began your remarks a moment ago by talking about as if you had to somehow object to something. There's no objection that needed to be made by him of your questioning of the witness for the rule of completeness to occur. I respectfully disagree in that point. If you read only part of an answer, if you're impeaching a witness and you only read half of his answer, the other side can object and say, rule of completeness, to clarify, you need to finish the answer. Or, she only read the first two questions, so the next third and fourth questions should be read as well, Your Honor. Your doing so is an objectionable counsel. Pardon me? Your doing so is an objectionable. The rule of completeness permits them to go through and complete it by either asking questions. It's not to say that they don't have to object to your questioning the witness, did you say X? Were you asked X and given the Y answer? There's nothing improper about that, and they don't have to object to it. Instead, what they can do is say, but there was more that you said on the subject, wasn't there, Mr. Witness? And what was it? Or what is the effect? Well, based on my reading of the case law, I believe that under the rule of completeness it's an exception and that you have to show that the testimony was misrepresenting the record, that there's a limited exception that you have to clarify or explain to do that, and it has to be necessary to explain to prevent distortion of the record, and what counsel did was stood there and read the discovery deposition of the doctor to the jury, leaving the jury with the impression that he was being complete and I was incomplete. Counsel, with respect to how that occurred, can you elaborate a little bit? I mean, did we have a situation where the question was posed to the doctor, doctor, during this deposition were you also asked this, and then the doctor gave an opportunity to say yes or no, and then did you give this answer, and then the doctor being given the opportunity to respond? Is that how it took place? No, it didn't. He handed the deposition to the doctor and the doctor said, you know, can you read these questions and answers, and the doctor just started reading, and it was literally, I mean, pages of his deposition, and I think, and then when I objected, and then I said there's not even a question, there was not even a question pending, then he would have him read and say, now did I accurately read what you testified to, and at one point he said, now is this consistent with what you told the jury today, asking him to comment on his earlier testimony, and if he believed he had been consistent. Did you object to that? Yes, I did. What did the trial judge say? The trial, well, I don't know in what order it occurred, but the trial judge first told the witness, when I objected, he said, you can read all day long if you want to, which, again, made me embarrassed and made me look bad, and I love Judge Little, he's one of my favorite judges, he does our asbestos docket indicator, I'm in front of him all the time, I don't think he meant it to be that way, but that's certainly the way it came across. When I objected again, he said, and this is all in front of the jury, I'm confused, you didn't like it when the witness was reading the deposition, now you don't like it when Mr. Hughes is reading it, you know, what do you want, kind of like, what do you want me to do? And I didn't know what to do, because I knew what he was doing was wrong, I've practiced enough and had enough trial experience, I'd never seen anything like this before, but this was all in front of the jury, and he was clearly going to allow the witness to do this and Mr. Hughes to do this, so I stopped objecting after that point, when I, you know, after he said those things in front of the jury to me about that and said, you can read all day long if you want to, and I don't think that that's the law, I think that was error, as a matter of fact, I think the judge had to first determine that what he was trying to read had to, was important enough to clarify or to explain the earlier testimony, and there was no determination of that by the trial court. So we have the Rule 213 violation, then we have the Rule 212 violation, we also had hearsay testimony that was new to me that came out during the trial, when the defense put, when the defense doctor testified in his own case in chief, one of the issues in this case was that the defendant should have done something to stop this bleeding, it was the plaintiff's position that he should have done something that night at 11 o'clock, but the doctor was getting phone calls throughout the early morning hours at 2 o'clock in the morning, and again, there was a 5 o'clock a.m. phone call, and at that point in time, even the defense expert agreed the surgery had to be done and had to be done right away, and the defendant doctor agreed it was really important to do the surgery as soon as possible. So why didn't he get to the hospital until 8, 20, 30, or whatever time? Did he ever explain where he was, what he was doing? No, he didn't. He never explained, and he never, he gave three different versions of what time he even got there. It was clear he got there after she died. It's clear he did. And he got that other call at 5, 08 a.m. Right. So where was he for three and a half hours? I got him to say, at first he said he was showering, and then he said he was shaving, and I'm looking at the guy, and I'm like, you have a beard, and he goes, well, I was trimming my beard. But he said that would only take about a half an hour. So you still have two and a half hours. Where was he? I have no idea. He's never testified to it. He's never accounted for his whereabouts, never admitted what happened during that time period. Did you argue that to the jury? In closing argument, I did, but I was responded to by defense counsel with hearsay testimony that he elicited from his own client, saying that at 5, 08 a.m., the nurse said she was stable. The nurse never said she was stable. Was it written in the medical notes? No, it was not. It's not in the medical records. It's not in the medical records anywhere, and the nurse's deposition was taken, and she did not say that. How come? Was she asked that question? I know it's not in the, I didn't review her death again, but she definitely did not testify to that. And nobody called her to testify at the trial? No, well, this first came out during the defendant's case in chief. You know what I mean? It was the end of the trial. And it was hearsay testimony elicited and put on by defense counsel of his own client. I remembered the other question I wanted to ask you. Is it unusual or not ethical to allow the defendant to read the deposition testimony of the experts? I don't think it's unethical, and I don't think it's necessarily unusual, but you always, I've always gotten a 213i supplement saying, by the way, I've now provided this opinion witness with this new testimony, and he's going to say A or B, and the rule requires it. Rule 213 is very strict. It is strictly interpreted. It requires it. I got none of that. I had no idea he had seen it. Sometimes they don't show them because they don't want to reproduce them for a second death, because if you do show the witness new materials, most trial courts will say, well, you get another deposition then of that person. He didn't want me, obviously, to have another crack at his client, so he never told me. I'm going to ask you this. I can look at the statute. The 213i, does it require them to punish you everything that an opinion expert has relied on? It requires you to seasonably supplement any new opinions that they have. Right. But I observed discovery asking, you know, what you had reviewed and all the rest. Okay. So. Counsel, regarding the nurse, of course, counsel on the other side basically is arguing that it wasn't offered for the truth of the matter asserted that it was offered to show the doctor why he did or didn't do whatever he did. And so isn't that why it came in and not for the truth that the patient was stable? Obviously, there was a huge problem with the patient, but this would explain why the doctor wasn't there or didn't get there sooner. His own statements show that that's not true. I mean, if you read his closing argument, he argued exactly what Justice Pope was saying, which is, well, yeah, he can't account for the three hours that he was missing, but he heard that she was stable. The nurse told him she was stable. This is complete hearsay. There's no exception. Well, wait a second, counsel. If testimony is offered to explain subsequent behavior, it's not hearsay testimony, is it? It's hearsay testimony if it's being offered for the truth of the matter asserted, and that's exactly what it was offered for, and that's what counsel argued it for to the jury. Did you ask for eliminating instruction? I asked for it not to be admitted. I said it was hearsay and objected at the time. But it's not hearsay if it's offered to explain the subsequent behavior of the person hearing it. It's not hearsay. It might not be substantive in the sense of evidence that she was, in fact, stable, but if it's pertinent and relevant to explain the conduct of, and he's the defendant, why did you do what you did? Well, because I relied upon this information. It's not hearsay. But it's admissible for a limited purpose that you ask for eliminating instruction. No, I did not ask for eliminating instruction. Or object to the argument of Mr. Hughes if it was being used substantively, as if it were true. That's what he argued to the jury. Did you object was my question. Did you object during the closing argument? No. See, if I'm the trial judge, you're looking at a panel here. We have 30-plus years' experience. I'm hearing Mr. Hughes make this argument that appears to be improper if it's suggesting this is substantive evidence, as opposed to explaining a limited purpose, explaining why the doctor did what he did. And I'm called upon to decide do I now sua sponte, interject in this case, in the absence of an objection that it's being used for substantive evidence, and I'm being put in the spot because you didn't object. Now, on appeal, you say, trial judge made a mistake. I am. I think that he did make a mistake, and I have the utmost respect for him, but he's a human being, and in the heat of the trial when things were happening, I think that there were mistakes that were made, and I don't think my client got a fair trial. Did you ask to call the nurse who the doctor said was the person who contacted him? No. Of whom he spoke? No. Even if it's in the middle of trial, if you believe it's a lie, it's hard for me to believe that Judge Little wouldn't have even suspended the proceedings to give you an opportunity to get this witness in here and talk to her. You didn't do that? I didn't ask him to suspend the trial. What if it's the truth? You've suggested to us it's a lie, but what is the basis of that? The fact that it appears nowhere in the medical records. The fact that the nurse was deposed and did not say that. The fact that it came up at the first time. Did you ask in your deposition of the nurse, did you talk to Dr. Eloy during this time period? I don't remember. I don't remember without looking back at her deposition, and I didn't re-review that. This trial was a while ago, and I did not re-review every deposition transcript that was taken. I was focusing on the errors that I think occurred. There was the Rule 213 violation. There's a violation of Rule 212. There's a hearsay testimony of Harmon. There was multiple patrillo violations in the case. So you think it's a patrillo violation if a doctor is contacted for scheduling and says nothing else? No, I think it's a patrillo violation. Well, yes, I do think if you send letters to the doctor, treating physicians asking them to contact you, it is a patrillo violation. Would we be the first court to so hold? No, actually not. Even in McMahon, they found that it was a patrillo violation. They just found it was de minimis. In the patrillo case and its progeny, they always find that it's a violation. It's just an issue as to whether or not it's de minimis or it's substantial enough to warrant a sanction. And in this case, we had a witness testify who had all of the materials he was given in the case were given to him by defense counsel. He talked to him before I was present at the deposition. He sent him letters. There was multiple communications. It was not de minimis. Thank you, counsel. Your time is up. You have an opportunity to address this again in rebuttal. Mr. Hughes? Thank you, Your Honor. Mr. Hughes, when did your client change his opinion concerning the cause of death? He didn't. Mr. Hughes? Your Honor. You see, English is my mother tongue. And I can read it. I can understand it. I can see it. Your client testified differently at trial than he did at his deposition regarding the cause of death. Your Honor, if I may, may I please squirt? Go ahead. And I appreciate it. So if you read the deposition of Dr. Aloi, what you'll find is that throughout that deposition and also throughout his testimony, or rather the medical record, it's always clear that Dr. Aloi was not certain as to the cause of death for this patient. That's present in the discharge summary in terms of his differential diagnosis. He gave at least three, I think it was five, different potential causes for death at that time. It was present in his consultation note. It was present throughout his deposition. And even in the very page of the deposition that counsel cited with respect to what she indicates is a change in position, in reality, on that very page of the deposition, he is asked, what was the cause of death? And his answer is, don't know. I think it was actually I don't know, but the I didn't come out. Well, what she asked was, do you know the cause of death? He said, I do not know. And then she said, within a reasonable degree of medical certainty, what do you believe the cause of death was? And then he said, bleeding varices or whatever he said. That is correct. And he said, most likely contributed to this as a cause. But he also throughout the course of the deposition I don't think he said contributed to it in the death. He answered yes to her question. Right. But throughout the deposition, Your Honor, he clearly maintained, and throughout, as I say, throughout the course of the medical record, maintained that there were other causes present for this death. What was his testimony at the trial when she asked him to a reasonable degree of medical certainty? Actually, Your Honor, I have that. It's page 88, I believe, of the trial transcript. Take me just one second to pull it up here. Page 88 of Volume 8, I believe, Your Honor. And this is her initial question to him regarding this, because I know they went on for quite some time. Edwards Direct Examination, Your Honor. And that is correct. And I'd like to note, by the way, and I think as Justice Steigman noted, during the course of this there was no objection to the testimony under a 213 objection. In fact, what she did is conduct what I consider to be a pretty robust cross-examination, which she carried out for quite some time. I think there was a sidebar where the 213 issue was raised, and then the record was made. Maybe I'm wrong. I don't believe at this time, Your Honor. There were numerous conferences throughout this with respect to a number of issues that were sidebars, including some 213 issues. If I may, at page 88, the question is asked, Now, there was also an opening reference to whether or not Laura died from these esophageal varices, bleeding, or whether there was some mysterious unknown event that had occurred. What is your opinion as to a reasonable degree of medical certainty as to the cause of Laura's death? Answer, I'm not exactly sure what caused her death. Okay. And I believe that variceal bleed had something to do with it. Isn't that distinctly different than what he testified to at his deposition? I don't believe it is, Your Honor, especially not in context of the Well, doesn't Garlock stand for the proposition she's entitled to believe she's going to be able to ask the same question and get the same answer at trial that she got at the deposition? Question at trial at the deposition was, So to a reasonable degree of medical certainty, you believe the esophageal varices bleed caused her death? Answer, yes. Isn't she entitled to that answer to that question at trial? I don't know that in the context of the way that this was asked that she is entitled to that same presentation. Remember, she prefaced this with the material whether Laura died from esophageal varices or whether there's some mysterious unknown event which had occurred. It is not exactly the same question. She prefaced that by bringing into this the fact that there may have been some other cause. Did he answer at trial the question when she repeated it at trial as he did at the deposition? He, in the next question, he is examined pursuant to his transcript, his deposition transcript, to which he then answers yes, in which the answer is read as yes. So she immediately moved to impeach him. Well, I'm reading from the transcript here. Do you remember being asked this question and giving this answer? So, to a reasonable degree of medical certainty, you believe the esophageal varices bleed caused her death? Answer, yes. Do you remember being asked this question and giving that answer? And then she did not get a yes response, did she? That's correct. What he said is if you read other parts of the deposition, I also mentioned that. Isn't she entitled to a yes response, Mr. Hughes?  I wrote Gerlach, Mr. Hughes. You're telling me that I forgot to add the phrase, period, and we mean it when I said counsel should be able to rely on it? No, Your Honor, I don't believe that at all. I think that what she got was the answer to the question that she asked. And I think it was an appropriate answer. The question he asked at the deposition, so to a reasonable degree of medical certainty, do you believe the esophageal varices bleed caused her death? Answer, yes. She never got that answer at trial. In Gerlach, if I may, wasn't Gerlach a presentation in the case in chief of the defense where the defendant, who was presenting the witness, asked the question, and it elicited a 180-year difference? No, no. Actually, it was cute. There was a change of opinion, and it was never elicited. And it came out in cross-examination by the plaintiff, who was sandbagged when the expert changed his opinion and said, hey, we didn't ask any of this stuff, said the defense. But the point is, the plaintiff in Gerlach, as the plaintiff here, should be able to rely upon the same question and the same answer from the expert. Now, to make clear, Mr. Hughes, if you wanted to go on with your examination of your client and say, but you also explained later in that deposition, didn't you, doctor, whatever you wanted to say? But she was entitled to the same question and the same answer, and she never got it, didn't she? Your Honor, not in the way that it was answered in this deposition. So why shouldn't we reverse, counsel? Well, there are a number of reasons. Number one is, she was able to, I think, very effectively pursue the process of impeachment. So she was due to good lawyering, she mitigated the damage she otherwise would have suffered by the failure, on your part, to disclose this change. Your Honor, I want to be clear. I do not believe there was any change in this opinion. I'll accept you that you do not believe it. You're wrong. There was a change, and I'm troubled by it. I can't speak for my colleagues, and the question is, what should be the result of this? Because I don't want to be hearing from other defense counsel, gee, I didn't think there was a change. Well, Your Honor. We reversed in Gerlach, as you may recall. I recall. Your Honor, to be clear, throughout the deposition, Dr. Alloy made it clear, and I mean this didn't just start in the deposition also, it was also throughout the medical record, that he did not have a solid opinion, I'll be clear, with respect to what the cause of death was. This was not a new opinion. The fact that he had dealt with respect to whether the legal. What else could it have been? Well, he mentioned, for instance, in his discharge note, she had, I believe it was acute peritonitis, bacterial peritonitis. She also could have aspirated. There are other explanations for this event. There was no autopsy. The question really is, did she get the same answer? The answer is no, and so why should we not reverse? Well, among other things, I don't believe that this is that prejudicial. I want to note, Your Honor, she didn't object. She didn't come in and say at that time, I object, I'm entitled to this answer. And if it was that prejudicial, I mean the truth is she moved rather smoothly, and I think very capably, into the impeachment and used that very well. Is Ms. Corwin correct that you asked your client, is your testimony today consistent with your deposition testimony? As to specific testimony, yes. How is he competent to answer that question, counsel? Because he had just given the same testimony, Your Honor. So he is now, you could have asked him, I guess, are you testifying truthfully to, or are you more accurate than the other witnesses? No, I don't believe that. How does this become an appropriate thing to ask a witness at trial? Well, I don't believe that was objected to, Your Honor, but for one thing, and let me be clear, to use the rule of completeness, all the testimony has to come from the witness. It can't come from counsel. So you've got to either ask the witness to read the testimony, you've got to read it and have them verify it. Ms. Corwin didn't have enough time to deal with it, but one thing that also troubles me is with regard to the background of your client in Mexico. Particularly after a motion to eliminate was filed and granted, how is it that it was pertinent to your client's background that his father had a heart attack when he was five years old? That particular evidence is probably not, Your Honor. Probably not? I don't want to put you on a limb here, Counsel. Maybe I've just missed the pertinence of the heart attack when he was five years old. If you look through that, you'll find that I actually immediately stepped in and said, move along, and tried to expedite through this. Here's why this became relevant, Your Honor. The motion limiting stated, and correctly, most of the time, this is not relevant. I don't have any problem with that. This is not something I would ordinarily include in any trial. On the other hand, what happened in this case, and Judge Little was very well aware of this, having sat through the cross-examination of my client, what Counsel tried to suggest is that because Dr. Aloy went to school in Mexico, he was not a qualified physician. How did she suggest that? By the way, his questions were asked. By the way, her questions were asked. Can you be more specific? I don't even have cited to that in my material. But her questions were, for instance, I can remember one right now. It's been quite a long time. So you went to Mexico to have your, and I want to be clear, this is not verbatim. You went to Mexico to go to school. You immediately came back to this country to practice. Therefore? Therefore, the impression is going to be that he went to Mexico because he had to go there to be accepted. The reality is he lived in Mexico. This is a de minimis. That still doesn't mean we need to mention a heart attack, though. I agree. Counsel, you're an experienced trial lawyer. This is your client, an experienced physician, who has now been subject to a motion to eliminate. Okay, so you're telling us, gee, it never occurred to me that I might want to prep him about the trial judge's limitations on his background and experience. Like, don't talk about your dad's heart attack when you were living in Mexico when you were five. I had no idea he was going to walk through that. And the transcript shows, as a matter of fact, you didn't intervene. What had happened is Ms. Corwin objected. And only after the objection was overruled did you finally move on to something else. Your Honor, the reason that it was overruled was because Judge Little recognized that based on the examination that had been performed, this is now relevant. And it was very limited. I limited my inquiry to, I don't recall how I asked the question, but how did you happen to be in Mexico? How did you happen to go to school in Mexico? I didn't try to elicit. The trials are not the... How did you get to Mexico? How long did you stay? Why did you go to school in Mexico? Were your questions... That was my question. And I wanted a quick, direct answer to that. But I don't... Counselor, I was a trial lawyer for a lot of years. And one of the things I prided myself in is, if the rules permitted it and my witnesses were gone, I could have testified in their behalf. So you're telling me you had no idea what your client, the doctor in this medical malpractice case, was going to say in response to these questions you asked, because you never asked them in advance of trial to hear his testimony? That particular question I did not ask ahead of time, Your Honor. But how should we view that, Counsel, given that there is a motion in limine made by Ms. Corrin specifically designed to keep out prejudicial family stuff like I was five years old when my dad died of a heart attack? Your Honor, I have to say I'm not sure that I see how prejudicial this is. It is relevant because it explains why he went to school in Mexico. It's pertinent to questions which were asked on cross-examination, and I am not a puppeteer. I'm not moving my... A puppeteer? I'm not... Had you asked him in advance of trial, and he told you this, you could have said, Doctor, don't be saying that on the witness stand, because that would be in violation of the court's order. Had I asked him this question ahead of time, I would have done that only. But of course you didn't. That's correct, Your Honor. And you're surprised by all of this. Why is it even relevant why he went to school in Mexico? It's made relevant by the questions which were asked with respect to his background and qualifications. Which was that he went to school in Mexico. Well, it was more than that, Your Honor. And again, I don't have that section of the transcript noted, but the questions that were asked were directed to suggest that Dr. Eloy was not a well-qualified physician. I mean, that's why she asked those questions. Mr. Hughes, am I wrong? Did you tell us today that she did not make a Rule 213 objection to Eloy's testimony? At the time that the testimony was given, and I think you're now referring to the causation testimony, Your Honor. Right. At the time that testimony was given, she rolled right into impeachment. She impeached him, but then she asked for a sidebar. She asked to strike his testimony, and Judge Little gave you a hearing after lunch. Isn't that true on that issue? I don't recall that. Outside the presence of the jury. I don't recall that. And then you argued there was no Rule 213 violation. Which I argued then, and I will argue again. So she did make an objection and asked to strike the testimony at the trial based on Rule 213 is what I'm getting at. Your Honor, that is correct. I won't argue with the court. I simply cannot. Throughout the course of this, this was a case which was hard tried by both sides. It was well tried by both sides, and it was well ruled on by Judge Little. The reality is that Judge Little heard all of this testimony, and Judge Little made a number of rulings on 213, many of which were on both sides. Many of which sustained objections. Others of which overruled objections. Because he was able to see that transcript. And the question Judge Little always asked us was the same thing. Where does this appear in the transcript? Showing where it is in the transcript. It is not a 213 violation. And that is the way that those rules work. If she can't get the same answer, it's a real 213 violation. You are duty bound to tell her that you weren't going to get the same answer at trial, so she wouldn't stumble upon it. That's what DARLOCK stands for. Well, I did not craft that answer. No, you didn't craft it. But you weren't surprised by it. And you knew your client was not going to say the answer to the question, yes, like he did at his deposition. Actually, Your Honor, I didn't know that. I don't. You mean you're going to trial this medical malpractice case, Mr. Hughes, and you never asked this question of your client? Obviously. Well, then you knew the answer was going to be different. No. What I knew is that Dr. Lloyd believed, because it was, again, consistent throughout the deposition and throughout all of the testimony, that there were other causes which were pertinent to this. What he didn't do was he didn't answer that question directly. That's a key question, Counselor. Well, Your Honor. At a minimum, you should have told Ms. Corwin that if you ask this question again of the doctor, you're going to get a different answer than you got at the deposition. Actually, I would have expected him to answer it the same. Because that question, the only causation opinion that he had within a reasonable degree of medical certainty was that one. Everything else was we have these other factors to look at, and that was, again, that was part of what was clear. Well, he could always have explained other factors, and he could always say this is what I meant. He was entitled to do that, but she was still first entitled to get her question answered. Again, Your Honor, I didn't craft that answer. I want to ask you a question. Yes. Did your client ever explain where he was between 5 and 830 in the morning? Actually, probably not. But that actually goes to that question of the hearsay, Your Honor, what he was told. And this is not hearsay. So the objection was to hearsay. It's not hearsay. It's an operative fact, or it explains his thought process. Did you argue as substantive knowledge or substantive evidence? I don't believe so, Your Honor. What happened is I read that, and I don't believe I'm arguing that this is substantive knowledge, Your Honor. I think what it is. You understand it's not substantive evidence. Your Honor, it is not. But what it does is it explains his thought process. For instance, the idea that the patient is stable, he doesn't know that. Only the nurse would know that. But the reality is what he does is at that time he orders a transfusion. And this was well explained as well. What you do with a patient who has had a bleed is you transfuse the patient. And those orders are right there. There was a lot of discussion about that. He ordered a transfusion to allow her to be hemodynamically stabilized so he could come in and then perform the procedure. What about the question Justice Pope asked? I'm not sure if I understood your answer. What happened during those three hours? Does your client ever account for it? I don't know that he does, Your Honor. His point in his testimony throughout was that the patient was being transfused so that she would be stable. I understand what he was told, but I want to know does he account for what he did? I don't know that he ever does, Your Honor. Again, if he doesn't have a reason to rush in because the patient is being transfused and stabilized. But her hemoglobin levels were at a panic level? They were at 6.2, Your Honor. Referred to that as a panic level? Referred to as a panic level. And that's why you transfuse them so that they can refill the tank with blood at that point. That's why a transfusion is ordered. Thank you, counsel. Ms. Corwin, your rebuttal? Thank you. I'd like to direct the court's attention to it's page 12 of our initial brief. One of the questions Mr. Hughes was asked was what was Dr. Eloy's response when I asked him the same question. And you can see from the transcript, it is at page 88. It's lines 3 through 15. He was specifically asked, What is your opinion to a reasonable degree of medical certainty as to the cause of Laura's death? He responded by saying he was not exactly sure and that something happened to Laura around 2 o'clock in the morning that changed the clinical picture entirely and he was not privy to whatever that change was. That is totally different than answering yes to the question that he was asked at his deposition. And this testimony, if you read Dr. User's testimony, is completely consistent. This idea that something unknown, neither doctor could say what it was, but just something unknown happened to her at 2 o'clock in the morning, he changed his testimony to comport with that of his expert because he was in the position, headed to trial, where we had an expert witness for a defendant that was actually offering inconsistent testimony with a defendant in the case. The second question... So then the question becomes, Okay, assume that we agree with you. What is the remedy? Should we reverse? As counsel pointed out, you did extremely effective cross-examination of the doctor in impeaching him on that. And so was that enough? I don't think so. As a matter of fact, didn't you in your cross-examination get before the jury the precise question and answer that he had given? And wasn't he forced to essentially weasel eyes right there in front of the jury? And really, to your credit, counsel, you know, this is a... Well, a lot of the cases... Well, I'm talking about as far as this particular point, because after all, there was Dr. User, and you had your expert as well, who was saying this was inadequate. Yes. But as far as the testimony of Dr. Eloy, it seems to me that in some sense, viewing this tactically, that you might have been even helped by showing him to be untrustworthy and coming up with new stories on the witness stand and looking just pretty bad. And that's where I guess it leads to the rule of completeness, which is, it ended up getting flipped on me, and my impeachment of him actually, and counsel even argued this in closing argument, that I was a cutter and paster. And I was just relying on statements he made at times in his deposition, but I wasn't relying on the whole thing. And then he was allowed to stand there and tell the jury, I just want to complete this, I just want to clarify, she's misrepresented this to the jury, and have the witness read page after page of his deposition with the judge saying, you can read all day if you want to. I don't end up on top on that. I end up on the bottom, which is where I ended up in the case. And if you add all these things together, and I agree with you, and the Garlock decision, I mean, Andy Kelly is the one who was cross-examining the witness, he's my current partner, I mean, he's a good lawyer, but you found, even though he was able to impeach the doctor, that there still was a new trial should be awarded, and Justice Steigman, in your decision, you say, where the jury hears improper evidence, the court always has the authority to award a new trial. And in this case, it wasn't just this one instance, like it was in White v. Garlock, I think there was multiple errors in this case, and we haven't even talked about jury selection, where I had to use a peremptory on Mr. Hughes, former babysitter. I mean, there was six different instances here where rules were broken, whether it be Petrillo, whether it be Rule 212, whether it be Rule 213, whether it be arguing and hearsay, and the other thing I have, which the court asked Mr. Hughes about, closing argument, this is in my reply brief at page 10, he told the jury she was stable. That is stating a fact and arguing that that is a fact to the jury, and that's at volume 7, line 49, line 4. So it wasn't just one thing, I think if it was, it still would have been enough under White v. Garlock, but in this case, my client did not get a fair trial. When you add all these errors up on top of each other, this lady bled to death in the hospital, and she's entitled to a fair trial of a jury to hear that evidence, and only the evidence that they should hear, just like Justice Steinman said in White v. Garlock. If there's improper evidence before the jury, you always have the right to award a new trial, and I'm asking this court to do that for this lady. Thank you, counsel. We'll take this matter into advisement to be in recess for a few moments.